21CV05493
Div2

# IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS

Michelle Tonkinson,
*
Michelle Tonkinson, as next friend of her minor daughter M.K.
*

                Plaintiffs

     vs.

Unknown Pharmacist Employed by Walmart
*
Walmart, Inc.
(f/k/a Wal-Mart Stores, Inc.)
702 SW 8th St.
Bentonville, AR 72716
3600 S Alden St Olathe, KS

                Defendants

Case No.
Div.

## Petition

    Plaintiffs Michelle Tonkinson and on behalf of her daughter M.K. (pseudonym) sets forth the following causes of action against Unknown Pharmacist Employed by Walmart and Walmart and alleges as follows:

Allegations Common to All Counts

1.    Plaintiffs Michelle Tonkinson (Michelle) and on behalf of her daughter M.K. is, and was at all times relevant hereto, a resident of Johnson County, Kansas.

2.    At all times relevant hereto, Michelle Tonkinson is the mother of M.K. who was a minor aged 15 at the time stated in this petition.

3.    Unknown Pharmacist injected M.K. with a substance. Unknown Pharmacist cannot be verified by name but upon information and belief was an employee of Walmart at the time.

4.    The location of the injection occurred at Walmart is located at 13600 S Alden St Olathe, KS.  It can be served with legal process through its registered agent Corporation Company, Inc. 112 S.W. 7th Street, 3C, Topeka, Kansas 66603.

EXHIBIT
A

*Clerk of the District Court, Johnson County Kansas*
*11/18/21  09:35am MM*

## JURISDICTION AND VENUE

5.    The acts hereinafter mentioned giving rise to these causes of action all took place in Johnson County, Kansas; the acts alleged herein against the defendants are torts; the amount of damages claimed by Michelle is in excess of $75,000.00; therefore, this Court has jurisdiction over this cause of action.

6.    Venue is proper in this Court pursuant to K.S.A. §§ 60-603 and 60-605.

## FACTS OF THE OCCURRENCE

7.    On or about September 10, 2021, at between 6:41 and 7:53 p.m., M.K. presented herself at Walmart accompanied by Jarod Duck, aged 21, to obtain what is called an Covid 19 vaccine injection – but the substance is not actually a vaccine. The petition refers to "vaccine" or "vaccination" only by nomenclature and this is not an admission or a contention that the substance injected into M.K. was a vaccine.  At this point it is unknown what was specifically injected into M.K. There was no emergency concerning M.K. when she presented herself at Walmart.

8.    Had any Walmart employee inquired, Michelle was available for contact to ascertain whether Michelle was giving consent to a Covid 19 injection into her daughter.

9.    When they approached the pharmacy counter, they explained that M.K. wanted to get a Covid 19 vaccine by herself and without parental consent as she was 15 years of age.  A Walmart employee at the counter stated that since because M.K. was 15 that she could be vaccine injected without parental consent.

10.    However, Walmart's own website states this:

Consent requirements for minors: Please speak with your pharmacist or visit your state department of health website to learn about immunization consent requirements for minors.

11.    In Kansas minors need written, notarized consent and the presence of a parent or legal guardian to receive a piercing or tattoo.

12.    Kansas law presumes that minors such as M.K. lack the necessary medical decision-making capacity and therefore require parental consent for most health care decisions, including vaccine injecting.

13.    Under K.S.A. 38-123b a minor 16 years of age or over, may give consent to hospital, medical or surgical treatment or procedures when no parent or guardian is immediately available.

14.    One or more of the Walmart employees believed to be a pharmacist gave M.K. a paper to fill out and sign.  At the bottom of the paperwork it stated Walmart needed a parent/legal guardian name and then asked for a signature. Mr. Duck informed M.K. that he couldn't help her with that and they both returned to the counter with the form.

15.    Upon seeing that there was no parental signature the employees turned to Mr. Duck and asked him if he was 18 years or older.  Mr. Duck replied "yes" and the employee then told him he needed to sign the paperwork. Mr. Duck replied that he was not able to do that.  The employee said it was still OK to sign because, according to the employee, it could be "any adult." One or more employees told them that because M.K. was 15 that anyone 18 years old or older only needed to be present.

16.     During the discussion with this pharmacist, another pharmacist in the back interrupted and said that M.K. was 15 and that they just needed someone 18 years or older to sign at the bottom of the document.

17.    It is believed by Mr. Duck that at this point in the conversation M.K. had already been vaccine injected by Unknown Pharmacist and the vaccine card had then been provided to M.K.

18.    Unknown Pharmacist injected M.K. with substance labeled a Pfizer covid vaccine on September 10, 2021, (FF2589) according to a vaccination record provided to Michelle's  daughter.

19.    Mr. Duck then walked off with the form they wanted him to sign thinking about what was being told to him.

20.    After time passed, Mr. Duck was approached again by the Walmart employees.  Mr. Duck again said he did not believe he had the authority to sign the document.  They then asked him if he was M.K.'s brother.  Mr. Duck stated he was a brother in law. He again told them he could not sign the document because he was not M.K.'s guardian, that he was only 21 years old and not her parent, and that he didn't want to get involved in what they were doing.

21.    The Walmart employees continued to badger and harass Mr. Duck telling him that M.K. was 15 and gave her own consent: that all that Mr. Duck was signing was the fact M.K. was with an adult. They told Mr. Duck that M.K. was free to consent to the injection and that it's occurrence was protected from disclosure (even to M.K.'s parents) by HIPPA and it was M.K.'s right to keep it private, and that no one would ever know Walmart gave M.K. the vaccine  injection.

*Clerk of the District Court, Johnson County Kansas*
*11/18/21  09:35am MM*

22.     Walmart made material misstatements of fact and law to M.K. and Mr. Duck as a means to deprive Michelle of her right to obtain and provide informed consent (or not provide consent) to the injection into her daughter, mislead both M.K. and Mr. Duck in order to obtain signatures, induce M.K. to be vaccine injected without parental consent, and to conspire with M.K. to keep what Walmart had done to M.K. a secret.

23.     No parent of M.K. provided Unknown Pharmacist or Walmart with consent for this procedure.

24.     In Kansas, a needle injection of a substance into a minor's body is considered a medical procedure requiring parental consent for that procedure.

25.     A minor aged 15 cannot consent to the Unknown Pharmacist's willful and intentional intrusion which is battery.

26.     There are numerous statistics indicating Covid 19 injections labeled vaccines create injury and permanent harm to the recipient.

27.     Having been vaccine injected, M.K.'s ability to develop long lasting natural immunities to all varieties or mutations of Covid 19 has been diminished or permanently altered to inhibit this from occurring due to the actions of the defendants.

28.     Studies indicate the Covid 19 substance believed to be injected into M.K. using a SARS–CoV–2 spike protein significantly inhibits DNA damage repair in M.K, which is required for effective V(D)J recombination in adaptive immunity. This is because the spike protein localizes in the nucleus and inhibits DNA damage repair by impeding key DNA repair protein BRCA1 and 53BP1 recruitment to the damage site. It creates a molecular mechanism by which the spike protein impede adaptive immunity.

29.     Studies now indicate the Covid 19 vaccines cause more harm than good. Classen B. US COVID-19 Vaccines Proven to Cause More Harm than Good Based on Pivotal Clinical Trial Data Analyzed Using the Proper Scientific Endpoint, "All Cause Severe Morbidity". Trends Int Med. 2021; 1(1): 1-6 ("one can expect an increase in adverse events in the vaccinated group for decades").

30.     Reports of serious adverse events from COVID-19 vaccines are underreported to VAERS. For example, according to the CDC, "Anaphylaxis after COVID-19 vaccination is rare and occurred in approximately 2 to 5 people per million vaccinated in the United States based on events reported to VAERS." This is in stark contrast to a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines and found "severe

reactions consistent with anaphylaxis occurred at a rate of 2.47 per 10,000 vaccinations." This is equivalent to 50 to 120 times more cases than what VAERS and the CDC are reporting. And this is for a serious, potentially life-threatening, adverse event that occurs almost immediately after vaccination and which vaccine providers are repeatedly advised to watch for and report.

31.    If anaphylaxis is being underreported, the level of underreporting for serious adverse events that do not occur immediately after vaccination or are not easily identified is likely far greater. For example, on June 23, 2021, the CDC reported the alarming numbers of reported myocarditis and pericarditis cases occurring after COVID-19 vaccination.[1] The long-term effects of myocarditis are not fully understood but can be very serious. Cases of thrombocytopenia have also occurred after COVID-19 vaccination, as well as serious and sometimes fatal blood clots.[2] These and numerous other serious adverse events are being recognized but the true rate of these serious adverse events is most certainly underreported.[3]

32.    Many injuries are delayed or not discovered until time passes or detailed testing is conducted.

33.     In Pfizer's FDA briefing document (Vaccines and Related Biological Products Advisory Committee Meeting October 26, 2021) (even according to the company's own unverified and misleading math), it admitted there is a scenario where there

---

[1] https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-06/03-COVIDShimabukuro-508.pdf at page 27.

[2]    See    https://www.fda.gov/news-events/press-announcements/joint-cdc-and-fda-statement-johnson-johnson-covid-19-vaccine.

[3] Research shows that the coronavirus spike protein from COVID-19 vaccines enters the bloodstream and can be found throughout the body in almost all vital organs. https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab465/6279075.    This would help explain the high rate of reported blood clots, heart disease, brain damage and reproductive issues. Dr. Byram Bridle, a viral immunologist and associate professor at the University of Guelph, Ontario, recently stated: "We made a big mistake. We didn't realize it until now…We thought the spike protein was a great target antigen, we never knew the spike protein itself was a toxin and was a pathogenic protein. So by vaccinating people we are inadvertently inoculating them with a toxin." https://omny.fm/shows/onpoint-with-alex-pierson/new-peer-reviewed-study-on-covid-19-vaccines-sugge. Recent data from Japan – data not required by the U.S. – reflects that lipid nano particles from the vaccine encapsuling the spike protein mRNA are being deposited into vital organs after vaccination. Of concern are the data related to lipid nano particles depositing into the adrenal glands, bone marrow, liver, ovaries, brain, and spleen and increasing in quantity over time post-vaccination.   https://www.icandecide.org/wp-content/uploads/2021/06/Translation-of-Japanese-data.pdf at 16-17.

*Clerk of the District Court, Johnson County Kansas*
*11/18/21  09:35am MM*

would be more hospitalizations among children for myocarditis (just one side effect) than from COVID. "Under Scenario 3 (lowest incidence), the model predicts more excess hospitalizations due to vaccine-related myocarditis/pericarditis compared to prevented hospitalizations due to COVID-19 in males and in both sexes combined." Page 33.

34.    Multiple recent studies and news reports detail young adults, ages 18-29, dying from myocarditis after receiving a COVID-19 vaccine. According to the CDC, 475 cases of pericarditis and myocarditis have been identified in vaccinated citizens aged 30 and younger. See FDA, Vaccines and Related Biological Products Advisory Committee      June      10,      2021,      Meeting      Presentation, https://www.fda.gov/media/150054/download#page=17 (last visited June 21,2021).

35.    The FDA found that young people ages 12-24 account for 8.8% of the vaccines administered; yet this demographic comprises 52% of the cases of myocarditis and pericarditis reported through May 31, 2021. Id.

36.    According to expert medical opinion, there are emerging trends demonstrating that any Covid-19 vaccine is especially risky for those in the 12 – 29 year-old demographic, with resulting complications in the cardiovascular, neurological, hematologic, and immune systems. (See, Rose J, et al). Increasingly, the medical community is acknowledging the possible risks and side effects inclusive of myocarditis, Bell's Palsy, Pulmonary Embolus, Pulmonary Immunopathology and severe allergic reaction causing anaphylactic shock. See Chien-Te Tseng, Elena Sbrana, Naoko Iwata-Yoshikawa, Patrick C Newman, Tania Garron, Robert L Atmar, Clarence J Peters, Robert B Couch, Immunization with SARS coronavirus vaccines leads to pulmonary immunopathology on challenge with the SARS virus, https://pubmed.ncbi.nlm.nih.gov/22536382/ (last visited June 21, 2021); Centers for Disease Control and Prevention, Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine—United States, December      14–23,      2020      (Jan      15,      2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7002e1.htm.

37.    The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis. It is known that myocarditis causes injury to heart muscle cells and may result in permanent heart damage culminating in heart failure, arrhythmias, and cardiac death. These conditions could call for a lifetime need for multiple medications, implantable cardio defibrillators, and heart transplantation. Heart failure has a five year 50% survival and would markedly reduce the lifespan of a child or young adult who develops this complication after vaccine-induced myocarditis (McCullough PA, Philbin EF, Spertus JA, Kaatz S, Sandberg KR, Weaver WD; Resource Utilization Among Congestive Heart Failure (REACH) Study. Confirmation of a heart failure epidemic: findings

from the Resource Utilization Among Congestive Heart Failure (REACH) study. J Am Coll Cardiol. 2002 Jan 2;39(1):60-9. doi: 10.1016/s0735-1097(01)01700-4.

38.     Because of the unauthorized injection of this untested substance, M.K. suffers from physical and mental issues that are causing or contributing to the cause of her physical problems.

**Count 1**
Right of Privacy
Both Defendants

39.     The above allegations are incorporated as fully set out.

40.     Defendants intentionally intruded upon the private affairs, concerns, and private relationship of Michelle and M.K. by intentionally, deliberately, and knowingly injecting M.K. with a substance while knowing this was being done without the knowledge, permission, or consent of M.K.'s parent. Defendants planned and proposed a course of action to conceal its conduct and the injection from Michelle. Michelle has requested the medical records from Walmart regarding this which Walmart refuses to provide her about her minor daughter. This conduct was and is highly offensive to Michelle and would be highly offensive to the average parent.

41.     Michelle did not consent to the invasion of this privacy. M.K. did not and could not consent to the invasion of this privacy.

42.     The acts of the defendants has caused mental distress to Michelle and has injured Michelle's intimidate association with her daughter, Michelle's parental right of control, the overall relationship between Michelle and her daughter, as well as the aforementioned consequences previously stated in this petition.

**Count 2**
Unknown Pharmacist
Battery

43.     The above allegations are incorporated as fully set out.

44.     Unknown Pharmacist made an unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact, that is harmful or offensive.

45.     The plaintiffs have been damaged.

**Count 3**
Unknown Pharmacist
Negligence

46.     The above allegations are incorporated as fully set out.

47.     Unknown Pharmacist had a duty to make a reasonable disclosure to the plaintiffs of the nature and probable consequences of the suggested or recommended treatment including the dangers which are possible in the treatment proposed. This disclosure is required so the patient can make an intelligent informed consent to the proposed treatment.

a. Failed to disclose sufficient information to allow Michelle to intelligently choose between proposed treatments and then consent to a proposed treatment;

b. Intentionally concealed from Michelle the proposed treatment upon M.K. and made material misrepresentations of fact and law to M.K. to induce M.K. to disregard her parent and her parental status;

c. In various and sundry other respects that are presently unknown to Michelle, but that Michelle verily believes will be revealed during the discovery process

48.     Unknown Pharmacist should not have performed any needle injection procedure on M.K. without the informed consent of Michelle who was authorized to give consent on behalf of M.K. because M.K. as the patient was unable to consent personally to the medical procedure because the patient M.K. was a minor.

49.     Informed consent means that the Michelle must have reasonable knowledge of the nature of the procedure and understanding of the risks involved, and the possible results to be anticipated.

50.     Unknown Pharmacist did not provide Michelle knowledge of the procedure and did not provide any understanding of all of the risks involved and the possible results of injecting M.K. with that substance.

51.     Unknown Pharmacist did not provide M.K. any understanding of the risks involved and the possible adverse results of that injection.

52.     Unknown Pharmacist did not make a reasonable disclosure to Michelle or M.K. of a medically acceptable alternative treatment, including the option of no treatment, particularly when vaccine injuries now exceed Covid 19 injuries, and when natural immunities provide lasting viable immunities to numerous variations of the virus when vaccine injecting wears off, and is of limited protection to the now many variants mutating.

a. Failed to disclose sufficient information to allow Michelle to intelligently choose between proposed treatments and then consent to a proposed treatment;

b. Misrepresented conversations in the charting and failed to accurately document conversations with Michelle;

c. Concealed problems or bad results from the surgery and recovery;

d. Failed to use proper surgical and rehabilitation techniques;

e. Failing to exercise the degree of skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists in the same field of expertise at the relevant time; and

f. In various and sundry other respects that are presently unknown to Michelle, but that Michelle verily believes will be revealed during the discovery process

53.    As a direct and proximate result of the intentional and willful carelessness and negligence of each of the defendants, as aforementioned, Michelle has been deprived of her parental rights, and their relationship has been damaged as well as M.K. being damaged by the vaccine injection.

54.    M.K. may require additional medical and surgical care and treatment for her injuries;

55.    Michelle has in the past and will in the future continue to incur substantial physician, hospital, medical, surgical, rehabilitative, and prescriptive expenses as a result of those injuries, the exact amount of which is not known to Michelle at the present time;

56.    Michelle and M.K. have in the past and will in the future continue to suffer great physical pain, mental anguish, anxiety, and loss of sleep;

57.    Michelle and M.K. have in the past and will in the future experience inconvenience and a loss of life's enjoyments.

58.    As a result of the foregoing injuries, all of which are a direct and proximate result of the negligence of the defendants, as aforementioned, Michelle has been damaged in a sum that exceeds $75,000.00.

*Clerk of the District Court, Johnson County Kansas*
                                      *11/18/21  09:35am MM*

**Count 4**
Negligence Walmart

59.     To the extent they do not conflict with the allegations contained in this count, Plaintiffs incorporate all other allegations of the Petition as if more fully set forth herein.

60.     Unknown Pharmacist was an express agent of Walmart. Unknown Pharmacist was an employee of Walmart.

61.     Walmart authorized Unknown Pharmacist to do and say all the things alleged in this petition pertaining to Unknown Pharmacist.

62.     Unknown Pharmacist was acting within the scope of her employment during the events identified in this petition.

63.     Both defendants owed Michelle and M.K. a duty to provide them with the degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession to care and to protect each from injury.

64.     Walmart and Unknown Pharmacist failed to provide the degree of skill and learning used under the same or similar circumstances by members of the defendant's profession and were jointly and severally, careless and negligent in the following particulars:

   a. Failing to have a system with policies and procedures in place to ensure it is capable of appropriately caring for its patients and providing sufficient information for consent and to obtain the proper consent; and/or
   b. Failing to train and/or instruct employees regarding the care and treatment of patients such as Michelle and M.K.; and/or
   c. Failing to have the adequate levels of administrative and/or staff necessary to perform and provide adequate and proper care to M.K.; and/or
   d. Failing to institute policies and procedures regarding appropriate care and follow up treatment for patients with resulting complications;
   e. Failing to institute policies and procedures regarding appropriate care to properly detect, discover and respond to complaints and concerns of Michelle; and/ or
   f. Failing to use reasonable care in employing and/or vetting and credentialing competent and careful physicians providing care to patients.

65.     As a direct and proximate result of the negligence of Walmart and its employees, Michelle and M.K. were caused injury including emotional distress, loss of sleep, anxiety, and as more fully described above.

10     *Clerk of the District Court, Johnson County Kansas*
*11/18/21  09:35am MM*

WHEREFORE, Michelle Tonkinson personally, and as next friend of her daughter M.K., pray for judgment against the defendant Unknown Pharmacist and the defendant Walmart in an amount that is fair and reasonable as determined by either the Court and/or a Jury and those damages permitted by law; for the plaintiffs' costs herein expended and incurred; and for such further and other relief as the Court deems just and proper under the premises.

JURY TRIAL DEMAND

PLAINTIFFs HEREBY REQUEST A JURY TRIAL

<u>By:/s/Linus L. Baker</u>
Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085-8922
913.486.3913
913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiffs

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL COURT DEPARTMENT


MICHELLE TONKINSON
                Plaintiff                Case No: 21CV05493
        vs                             Division:   2
                                      K.S.A. Chapter 60
WALMART INC
                Defendant


REQUEST AND SERVICE INSTRUCTION FORM


To:  Clerk of the District Court:


Please issue a SUMMONS and PETITION in this action for WALMART INC whose address for service is:

      112 S.W. 7TH STREET 3C
      TOPEKA, KS 66603


Certified mail service by the undersigned attorney, who understands that it is their responsibility to obtain service and to make the return to the clerk.  The postal receipt for service must be filed with the Clerk's office to prove service.


REGISTERED AGENT CORPORATION COMPANY, INC.
112 S.W. 7TH STREET, 3C, TOPEKA, KANSAS 66603


                      By: /s/ LINUS L BAKER
                      LINUS L BAKER, #18197
                      6732 W 185TH TER
                      STILWELL, KS 660858922
                      913-486-3913

# IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS

Michelle Tonkinson,
\*
Michelle Tonkinson, as next friend of her
minor daughter M.K.
\*
                    Plaintiffs

     vs.

Unknown Pharmacist Employed by
Walmart
\*
Walmart, Inc.
(f/k/a Wal-Mart Stores, Inc.)
702 SW 8th St.
Bentonville, AR 72716
3600 S Alden St Olathe, KS

                    Defendants

Case No. 21CV05493
Div. 2

## **Amended Petition**

Plaintiffs Michelle Tonkinson and on behalf of her daughter M.K. (pseudonym)

sets forth the following causes of action against Unknown Pharmacist Employed by

Walmart and Walmart and alleges as follows:

### Allegations Common to All Counts

1.     Plaintiffs Michelle Tonkinson (Michelle) and on behalf of her daughter M.K. is, and was at all times relevant hereto, a resident of Johnson County, Kansas.

2.     At all times relevant hereto, Michelle Tonkinson is the mother of M.K. who was a minor aged 15 at the time stated in this petition.

3.     Unknown Pharmacist injected M.K. with a substance. Unknown Pharmacist cannot be verified by name but upon information and belief was an employee of Walmart at the time.

4.     The location of the injection occurred at Walmart is located at 13600 S Alden St Olathe, KS.  It can be served with legal process through its registered agent Corporation Company, Inc. 112 S.W. 7th Street, 3C, Topeka, Kansas 66603.

## JURISDICTION AND VENUE

5.      The acts hereinafter mentioned giving rise to these causes of action all took place in Johnson County, Kansas; the acts alleged herein against the defendants are torts; the amount of damages claimed by Michelle is in excess of $75,000.00; therefore, this Court has jurisdiction over this cause of action.

6.      Venue is proper in this Court pursuant to K.S.A. §§ 60-603 and 60-605.

## FACTS OF THE OCCURRENCE

7.      On or about September 10, 2021, at between 6:41 and 7:53 p.m., M.K. presented herself at Walmart accompanied by Jarod Duck, aged 21, to obtain what is called a Covid 19 vaccine injection – but the substance is not actually a vaccine.  The petition refers to "vaccine" or "vaccination" only by nomenclature and this is not an admission or a contention that the substance injected into M.K. was a vaccine.  At this point it is unknown what was specifically injected into M.K. There was no emergency concerning M.K. when she presented herself at Walmart.

8.      Had any Walmart employee inquired, Michelle was available for contact to ascertain whether Michelle was giving consent to a Covid 19 injection into her daughter.

9.      When they approached the pharmacy counter, they explained that M.K. wanted to get a Covid 19 vaccine by herself and without parental consent as she was 15 years of age.  A Walmart employee at the counter stated that since because M.K. was 15 that she could be vaccine injected without parental consent.

10.     However, Walmart's own website states this:

Consent requirements for minors: Please speak with your pharmacist or visit your state department of health website to learn about immunization consent requirements for minors.

11.     In Kansas minors need written, notarized consent and the presence of a parent or legal guardian to receive a piercing or tattoo.

12.     Kansas law presumes that minors such as M.K. lack the necessary medical decision-making capacity and therefore require parental consent for most health care decisions, including vaccine injecting.

13.     Under K.S.A. 38-123b a minor 16 years of age or over, may give consent to hospital, medical or surgical treatment or procedures when no parent or guardian is immediately available.

14.     One or more of the Walmart employees believed to be a pharmacist gave M.K. a paper to fill out and sign.  At the bottom of the paperwork it stated Walmart needed a parent/legal guardian name and then asked for a signature. Mr. Duck informed M.K. that he couldn't help her with that and they both returned to the counter with the form.

15.     Upon seeing that there was no parental signature the employees turned to Mr. Duck and asked him if he was 18 years or older.  Mr. Duck replied "yes" and the employee then told him he needed to sign the paperwork. Mr. Duck replied that he was not able to do that.  The employee said it was still OK to sign because, according to the employee, it could be "any adult." One or more employees told them that because M.K. was 15 that anyone 18 years old or older only needed to be present.

16.      During the discussion with this pharmacist, another pharmacist in the back interrupted and said that M.K. was 15 and that they just needed someone 18 years or older to sign at the bottom of the document.

17.     It is believed by Mr. Duck that at this point in the conversation M.K. had already been vaccine injected by Unknown Pharmacist and the vaccine card had then been provided to M.K.

18.     Unknown Pharmacist injected M.K. with substance labeled a Pfizer covid vaccine on September 10, 2021, (FF2589) according to a vaccination record provided to Michelle's  daughter.

19.     Mr. Duck then walked off with the form they wanted him to sign thinking about what was being told to him.

20.     After time passed, Mr. Duck was approached again by the Walmart employees. Mr. Duck again said he did not believe he had the authority to sign the document. They then asked him if he was M.K.'s brother.  Mr. Duck stated he was a brother in law. He again told them he could not sign the document because he was not M.K.'s guardian, that he was only 21 years old and not her parent, and that he didn't want to get involved in what they were doing.

21.     The Walmart employees continued to badger and harass Mr. Duck telling him that M.K. was 15 and gave her own consent: that all that Mr. Duck was signing was the fact M.K. was with an adult. They told Mr. Duck that M.K. was free to consent to the injection and that it's occurrence was protected from disclosure (even to M.K.'s parents) by HIPPA and it was M.K.'s right to keep it private, and that no one would ever know Walmart gave M.K. the vaccine  injection.

22.     Walmart made material misstatements of fact and law to M.K. and Mr. Duck as a means to deprive Michelle of her right to obtain and provide informed consent (or not provide consent) to the injection into her daughter, mislead both M.K. and Mr. Duck in order to obtain signatures, induce M.K. to be vaccine injected without parental consent, and to conspire with M.K. to keep what Walmart had done to M.K. a secret.

23.     No parent of M.K. provided Unknown Pharmacist or Walmart with consent for this procedure.

24.     In Kansas, a needle injection of a substance into a minor's body is considered a medical procedure requiring parental consent for that procedure.

25.     A minor aged 15 cannot consent to the Unknown Pharmacist's willful and intentional intrusion which is battery.

26.     There are numerous statistics indicating Covid 19 injections labeled vaccines create injury and permanent harm to the recipient.

27.     Having been vaccine injected, M.K.'s ability to develop long lasting natural immunities to all varieties or mutations of Covid 19 has been diminished or permanently altered to inhibit this from occurring due to the actions of the defendants.

28.     Studies indicate the Covid 19 substance believed to be injected into M.K. using a SARS–CoV–2 spike protein significantly inhibits DNA damage repair in M.K, which is required for effective V(D)J recombination in adaptive immunity. This is because the spike protein localizes in the nucleus and inhibits DNA damage repair by impeding key DNA repair protein BRCA1 and 53BP1 recruitment to the damage site. It creates a molecular mechanism by which the spike protein impede adaptive immunity.

29.     Studies now indicate the Covid 19 vaccines cause more harm than good. Classen B. US COVID-19 Vaccines Proven to Cause More Harm than Good Based on Pivotal Clinical Trial Data Analyzed Using the Proper Scientific Endpoint, "All Cause Severe Morbidity". Trends Int Med. 2021; 1(1): 1-6 ("one can expect an increase in adverse events in the vaccinated group for decades").

30.     Reports of serious adverse events from COVID-19 vaccines are underreported to VAERS. For example, according to the CDC, "Anaphylaxis after COVID-19 vaccination is rare and occurred in approximately 2 to 5 people per million vaccinated in the United States based on events reported to VAERS." This is in stark contrast to a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines and found "severe reactions consistent with anaphylaxis occurred at a rate of 2.47 per 10,000 vaccinations." This is equivalent to 50 to 120 times more cases than what VAERS and the CDC are reporting. And this is for a serious, potentially life-threatening, adverse event that

occurs almost immediately after vaccination and which vaccine providers are repeatedly advised to watch for and report.

31.    If anaphylaxis is being underreported, the level of underreporting for serious adverse events that do not occur immediately after vaccination or are not easily identified is likely far greater. For example, on June 23, 2021, the CDC reported the alarming numbers of reported myocarditis and pericarditis cases occurring after COVID-19 vaccination.[1] The long-term effects of myocarditis are not fully understood but can be very serious. Cases of thrombocytopenia have also occurred after COVID-19 vaccination, as well as serious and sometimes fatal blood clots.[2] These and numerous other serious adverse events are being recognized but the true rate of these serious adverse events is most certainly underreported.[3]

32.    Many injuries are delayed or not discovered until time passes or detailed testing is conducted.

33.    In Pfizer's FDA briefing document (Vaccines and Related Biological Products Advisory Committee Meeting October 26, 2021) (even according to the company's own unverified and misleading math), it admitted there is a scenario where there would be more hospitalizations among children for myocarditis (just one side effect) than from COVID. "Under Scenario 3 (lowest incidence), the model predicts more excess hospitalizations due to vaccine-related myocarditis/pericarditis compared to

---

[1] https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-06/03-COVIDShimabukuro-508.pdf at page 27.
[2]    See    https://www.fda.gov/news-events/press-announcements/joint-cdc-and-fda-statement-johnson-johnson-covid-19-vaccine.
[3] Research shows that the coronavirus spike protein from COVID-19 vaccines enters the bloodstream and can be found throughout the body in almost all vital organs. https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab465/6279075.    This would help explain the high rate of reported blood clots, heart disease, brain damage and reproductive issues. Dr. Byram Bridle, a viral immunologist and associate professor at the University of Guelph, Ontario, recently stated: "We made a big mistake. We didn't realize it until now…We thought the spike protein was a great target antigen, we never knew the spike protein itself was a toxin and was a pathogenic protein. So by vaccinating people we are inadvertently inoculating them with a toxin." https://omny.fm/shows/onpoint-with-alex-pierson/new-peer-reviewed-study-on-covid-19-vaccines-sugge. Recent data from Japan – data not required by the U.S. – reflects that lipid nano particles from the vaccine encapsuling the spike protein mRNA are being deposited into vital organs after vaccination. Of concern are the data related to lipid nano particles depositing into the adrenal glands, bone marrow, liver, ovaries, brain, and spleen and increasing in quantity over time post-vaccination. https://www.icandecide.org/wp-content/uploads/2021/06/Translation-of-Japanese-data.pdf at 16-17.

*Clerk of the District Court, Johnson County Kansas*
*12/03/21  02:33pm ML*

prevented hospitalizations due to COVID-19 in males and in both sexes combined." Page 33.

34.     Multiple recent studies and news reports detail young adults, ages 18-29, dying from myocarditis after receiving a COVID-19 vaccine. According to the CDC, 475 cases of pericarditis and myocarditis have been identified in vaccinated citizens aged 30 and younger. See FDA, Vaccines and Related Biological Products Advisory Committee June 10, 2021, Meeting Presentation, https://www.fda.gov/media/150054/download#page=17 (last visited June 21,2021).

35.     The FDA found that young people ages 12-24 account for 8.8% of the vaccines administered; yet this demographic comprises 52% of the cases of myocarditis and pericarditis reported through May 31, 2021. Id.

36.     According to expert medical opinion, there are emerging trends demonstrating that any Covid-19 vaccine is especially risky for those in the 12 – 29 year-old demographic, with resulting complications in the cardiovascular, neurological, hematologic, and immune systems. (See, Rose J, et al). Increasingly, the medical community is acknowledging the possible risks and side effects inclusive of myocarditis, Bell's Palsy, Pulmonary Embolus, Pulmonary Immunopathology and severe allergic reaction causing anaphylactic shock. See Chien-Te Tseng, Elena Sbrana, Naoko Iwata-Yoshikawa, Patrick C Newman, Tania Garron, Robert L Atmar, Clarence J Peters, Robert B Couch, Immunization with SARS coronavirus vaccines leads to pulmonary immunopathology on challenge with the SARS virus, https://pubmed.ncbi.nlm.nih.gov/22536382/ (last visited June 21, 2021); Centers for Disease Control and Prevention, Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine—United States, December 14–23, 2020 (Jan 15, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7002e1.htm.

37.     The Centers for Disease Control has held emergency meetings on this issue and the medical community is responding to the crisis. It is known that myocarditis causes injury to heart muscle cells and may result in permanent heart damage culminating in heart failure, arrhythmias, and cardiac death. These conditions could call for a lifetime need for multiple medications, implantable cardio defibrillators, and heart transplantation. Heart failure has a five year 50% survival and would markedly reduce the lifespan of a child or young adult who develops this complication after vaccine-induced myocarditis (McCullough PA, Philbin EF, Spertus JA, Kaatz S, Sandberg KR, Weaver WD; Resource Utilization Among Congestive Heart Failure (REACH) Study. Confirmation of a heart failure epidemic: findings from the Resource Utilization Among Congestive Heart Failure (REACH) study. J Am Coll Cardiol. 2002 Jan 2;39(1):60-9. doi: 10.1016/s0735-1097(01)01700-4.

38.     Because of the unauthorized injection of this untested substance, M.K. suffers from physical and mental issues that are causing or contributing to the cause of her physical problems.

## Count 1
### Right of Privacy
### Both Defendants

39.     The above allegations are incorporated as fully set out.

40.     Defendants intentionally intruded upon the private affairs, concerns, and private relationship of Michelle and M.K. by intentionally, deliberately, and knowingly injecting M.K. with a substance while knowing this was being done without the knowledge, permission, or consent of M.K.'s parent.  Defendants planned and proposed a course of action to conceal its conduct and the injection from Michelle. Michelle has requested the medical records from Walmart regarding this which Walmart refuses to provide her about her minor daughter. This conduct was and is highly offensive to Michelle and would be highly offensive to the average parent.

41.     Michelle did not consent to the invasion of this privacy. M.K. did not and could not consent to the invasion of this privacy.

42.     The acts of the defendants has caused mental distress to Michelle and has injured Michelle's intimidate association with her daughter, Michelle's parental right of control, the overall relationship between Michelle and her daughter, as well as the aforementioned consequences previously stated in this petition.

## Count 2
### Unknown Pharmacist
### Battery

43.     The above allegations are incorporated as fully set out.

44.     Unknown Pharmacist made an unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact, that is harmful or offensive.

45.     The plaintiffs have been damaged.

## Count 3
### Unknown Pharmacist
### Negligence

46.     The above allegations are incorporated as fully set out.

47.    Unknown Pharmacist had a duty to make a reasonable disclosure to the plaintiffs of the nature and probable consequences of the suggested or recommended treatment including the dangers which are possible in the treatment proposed. This disclosure is required so the patient can make an intelligent informed consent to the proposed treatment.

    a. Failed to disclose sufficient information to allow Michelle to intelligently choose between proposed treatments and then consent to a proposed treatment;

    b. Intentionally concealed from Michelle the proposed treatment upon M.K. and made material misrepresentations of fact and law to M.K. to induce M.K. to disregard her parent and her parental status;

    c. In various and sundry other respects that are presently unknown to Michelle, but that Michelle verily believes will be revealed during the discovery process

48.    Unknown Pharmacist should not have performed any needle injection procedure on M.K. without the informed consent of Michelle who was authorized to give consent on behalf of M.K. because M.K. as the patient was unable to consent personally to the medical procedure because the patient M.K. was a  minor.

49.    Informed consent means that the Michelle must have reasonable knowledge of the nature of the procedure and understanding of the risks involved, and the possible results to be anticipated.

50.    Unknown Pharmacist did not provide Michelle knowledge of the procedure and did not provide any understanding of all of the risks involved and the possible results of injecting M.K. with that substance.

51.    Unknown Pharmacist did not provide M.K. any understanding of the risks involved and the possible adverse results of that injection.

52.    Unknown Pharmacist did not make a reasonable disclosure to Michelle or M.K. of a medically acceptable alternative treatment, including the option of no treatment, particularly when vaccine injuries now exceed Covid 19 injuries, and when natural immunities provide lasting viable immunities to numerous variations of the virus when vaccine injecting wears off, and is of limited protection to the now many variants mutating.

    a. Failed to disclose sufficient information to allow Michelle to intelligently choose between proposed treatments and then consent to a proposed treatment;

*Clerk of the District Court, Johnson County Kansas*
*12/03/21  02:33pm ML*

b.  Misrepresented conversations in the charting and failed to accurately document conversations with Michelle;

c.  Concealed problems or bad results from the surgery and recovery;

d.  Failed to use proper surgical and rehabilitation techniques;

e.  Failing to exercise the degree of skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists in the same field of expertise at the relevant time; and

f.  In various and sundry other respects that are presently unknown to Michelle, but that Michelle verily believes will be revealed during the discovery process

53.   As a direct and proximate result of the intentional and willful carelessness and negligence of each of the defendants, as aforementioned, Michelle has been deprived of her parental rights, and their relationship has been damaged as well as M.K. being damaged by the vaccine injection.

54.   M.K. may require additional medical and surgical care and treatment for her injuries;

55.   Michelle has in the past and will in the future continue to incur substantial physician, hospital, medical, surgical, rehabilitative, and prescriptive expenses as a result of those injuries, the exact amount of which is not known to Michelle at the present time;

56.   Michelle and M.K. have in the past and will in the future continue to suffer great physical pain, mental anguish, anxiety, and loss of sleep;

57.   Michelle and M.K. have in the past and will in the future experience inconvenience and a loss of life's enjoyments.

58.   As a result of the foregoing injuries, all of which are a direct and proximate result of the negligence of the defendants, as aforementioned, Michelle has been damaged in a sum that exceeds $75,000.00.


## Count 4
### Negligence Walmart

59.   To the extent they do not conflict with the allegations contained in this count, Plaintiffs incorporate all other allegations of the Petition as if more fully set forth herein.

60.     Unknown Pharmacist was an express agent of Walmart. Unknown Pharmacist was an employee of Walmart.

61.     Walmart authorized Unknown Pharmacist to do and say all the things alleged in this petition pertaining to Unknown Pharmacist.

62.     Unknown Pharmacist was acting within the scope of her employment during the events identified in this petition.

63.     Both defendants owed Michelle and M.K. a duty to provide them with the degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession to care and to protect each from injury.

64.     Walmart and Unknown Pharmacist failed to provide the degree of skill and learning used under the same or similar circumstances by members of the defendant's profession and were jointly and severally, careless and negligent in the following particulars:

   a.  Failing to have a system with policies and procedures in place to ensure it is capable of appropriately caring for its patients and providing sufficient information for consent and to obtain the proper consent; and/or
   b.  Failing to train and/or instruct employees regarding the care and treatment of patients such as Michelle and M.K.; and/or
   c.  Failing to have the adequate levels of administrative and/or staff necessary to perform and provide adequate and proper care to M.K.; and/or
   d.  Failing to institute policies and procedures regarding appropriate care and follow up treatment for patients with resulting complications; and/or
   e.  Failing to institute policies and procedures regarding appropriate care to properly detect, discover and respond to  complaints and concerns of Michelle; and/ or
   f.  Failing to use reasonable care in employing and/or vetting and credentialing competent and careful physicians providing care to patients.

65.     As a direct and proximate result of the negligence of Walmart and its employees, Michelle and M.K. were caused injury including emotional distress, loss of sleep, anxiety, and as more fully described above.

## Count 5
## Consumer Protection

66.     To the extent they do not conflict with the allegations contained in this count, Plaintiffs incorporate all other allegations of the Petition as if more fully set forth herein.

*Clerk of the District Court, Johnson County Kansas*
*12/03/21  02:33pm ML*

67.     Plaintiffs were a consumer as defined under PIK 129.01.

68.     Defendants are each a supplier of medical services  (supplier defined under PIK 129.01).

69.     On the dates and times stated herein, the defendants knew M.K. was a minor aged 15 and represented to her that she did not need parental consent in order to be injected with the substance injected into her by the defendants.

70.     This was a misrepresentation, including, but not excluding other provisions of the KCPA, a false representation of consumer rights, remedies, and obligations under K.S.A. 50-626(b)(8).

71.     Defendants made such representation to M.K. knowing there was no medical emergency and that M.K. did not have parental consent for the injection into M.K.

72.     This was a consumer transaction as defined under PIK 129.01.

73.     Defendants each engaged in deceptive acts and practices under the KCPA.

74.     The plaintiffs sustained an injury from the supplier's violations, and that the supplier's actions were deceptive or unconscionable.

75.     The defendants have engaged in a willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact as described herein.

76.     Many examples: it is deceptive to inject a minor aged 15 without parental consent, then knowing the minor does not have parental consent and then conceal that information from a parent, and then to withhold that information from the parent when it was requested.

77.     The transaction was deceptive because the defendants had M.K. participate in a medical experiment because substance injected into M.K. was not a fully licensed vaccine and was instead only under the Emergency Use Authorization (EUA) – which EUA products are considered experimental.

78.     The defendants took advantage of the inability of the plaintiffs to reasonably protect the consumer's interests because of the defendants' concealment of the transaction from the parent and the consumers' lack of knowledge or inability to discern risks of the injection.

79.    There can be no biologic license approved to a medical product for diagnosing, preventing or treating COVID-19 if there is also still an Emergency Use Authorization for the same medical product serving the same purpose.

80.    Under PIK 129.01, "an act may constitute a deceptive act or practice whether or not the consumer has in fact been misled."

81.    Generally, what people think of as the Pfizer vaccine has two distinct FDA approval statuses. It is licensed—that is, fully approved—for the two-dose application in those 16 and older. But it is unlicensed and operating under an EUA— that is, an emergency use authorization—for other applications, like for children under 16 and for certain third shots (as further explained in detail below).

82.    The defendants deceptive practices include misrepresenting or withholding information about the substance it labeled in the vaccination record as "Pfizer FF2589" and not telling either of the plaintiffs about the risks and that they have the right to decline a medication that is not fully licensed.

83.    The FDA includes the Nuremberg Code and the Helsinki Declaration on its website, emphasizing the fact that people cannot be forced to take experimental drugs without their full consent.

84.    Upon information and belief, Pfizer FF2589 is experimental and not FDA approved.

85.    Pfizer developed a COVID-19 vaccine, for which the FDA issued an Emergency Use Authorization ("EUA"). This allowed Pfizer to distribute the vaccine starting in December 2020.

86.    An EUA is not a full FDA license. It instead represents the FDA's conclusion that a product may be effective against a disease in a public health emergency where there is no "adequate, approved, and available alternative." See generally 21 U.S.C. § 360bbb-3(a)-(c).

87.    EUA drugs must include labeling and package inserts telling patients "of the option to accept or refuse administration of the product." Id. § 360bbb-3(e)(1)(A)(ii)(III).

88.    On August 23, 2021 – roughly eight months after the EUA first became effective – the FDA approved a Biologics License Application ("BLA") and issued a full FDA license to produce and distribute the vaccine and label it with its proprietary name, "Comirnaty." The BLA approval requires that Pfizer produce Comirnaty only at approved locations, subject to specific manufacturing, packaging, and labeling requirements.

89.     Pfizer EUA and Comirnaty vaccines are not interchangeable.

90.     Vaccines sent into interstate commerce before August 23 – and vaccines produced after August 23 in unapproved facilities – remain "products authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act." § 1107a(a)(1).

91.     Pfizer continues to produce vials of vaccine that are labeled as an EUA drug with packaging material saying, "This product has not been approved or licensed by the FDA." And there remains a significant amount of Pfizer COVID-19 vaccine that was manufactured and labeled in accordance with the EUA.

92.     Under the EUA statute, recipients such as M.K. of EUA drugs must be "informed . . . of the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).

93.     As a direct and proximate result of the violations of the consumer protection statute, Michelle and M.K. seek all remedies, including the award of reasonable attorney fees, under the statute.

    WHEREFORE, Michelle Tonkinson personally, and as next friend of her daughter M.K., pray for judgment against the defendant Unknown Pharmacist and the defendant Walmart in an amount that is fair and reasonable as determined by either the Court and/or a Jury and those damages permitted by law; for the plaintiffs' costs herein expended and incurred; and for such further and other relief as the Court deems just and proper under the premises.

JURY TRIAL DEMAND

PLAINTIFFs HEREBY REQUEST A JURY TRIAL

By:/s/Linus L. Baker
Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085-8922
913.486.3913
913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiffs

13